# United States Court of Appeals
### For the Eighth Circuit

_____

No. 17-2726

_____

United States of America

*Plaintiff - Appellee*

v.

Larry Lee Henderson

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: April 12, 2018
Filed: August 30, 2018

_____

Before SMITH, Chief Judge, WOLLMAN and LOKEN, Circuit Judges.

_____

SMITH, Chief Judge.

Larry Lee Henderson challenges the district court's[1] revocation of his supervised release, claiming insufficiency of the evidence. He also contends that two special conditions of his supervised release (1) are not reasonably related to the 18

_____

[1]The Honorable Henry E. Autrey, United States District Judge for the Eastern District of Missouri.

U.S.C. § 3583(d) sentencing factors; (2) involve a greater deprivation of liberty than reasonably necessary; and (3) are inconsistent with the pertinent Sentencing Commission policy statements. We affirm.

## I. *Background*
### A. *Original Conviction*

In February 2014, while completing a prison term at a Bureau of Prisons halfway house, Henderson fraudulently purchased a car. As laid out in the undisputed presentence investigation report (PSR), Henderson obtained a 2004 Chevrolet Tahoe, priced at $13,871.50, from Driver Seat Auto Sales, LLC ("Driver Seat Auto"), in St. Charles, Missouri. Henderson identified himself as bishop, pastor, and chairman of the Holy Temple National Assembly of Churches, Inc., also known as the World Council of the National Assembly of Churches, Inc. To make the purchase, Henderson presented the car dealership with a $1,200 check as down payment. To obtain financing for the remainder of the purchase price, Henderson completed an online loan application, where he falsely claimed to be employed by the "US Ecclesiastical Court," drawing a salary of $5,800 per month. PSR at 5, *United States v. Henderson*, No. 4:14-cr-00207-HEA (E.D. Mo. Nov. 3, 2014), ECF No. 32. He produced two paystubs purportedly from the "US Ecclesiastical Court," as well as a 2013 Wage and Tax Statement (W-2) from the same company.[2] *Id.* The W-2 noted Henderson's salary at $62,882.56. Based on the false information he provided, Henderson received approval for his online financing application, and Henderson drove away in the Tahoe.

Henderson's down payment check to Driver Seat Auto bounced. Its bank informed the dealership that the check came from a closed account. The company then contacted Henderson, who—after multiple collection attempts—promised to

---

[2]Henderson was not employed during these times, as he spent most of the previous eight years in prison.

make good on the down payment. Two months later, Henderson paid the company with a cashier's check, satisfying the down payment amount. Around the same time, Henderson fraudulently procured a Missouri Department of Revenue Notice of Lien Release ("Lien Release") for the Tahoe. He then used that document to apply for—and receive—a $4,000 loan from the Missouri Title Loan Company in St. Louis, Missouri. On his loan application, Henderson claimed—falsely—to be employed by an entity called "US Legal," with a salary of $2,370 every two weeks. *Id.* Henderson subsequently cashed the $4,000 check; he kept $2,000 as cash and placed $2,000 as a cashier's check payable to the Holy Temple National Assembly Church. Henderson also received another loan from Missouri Title Loan for $1,200 based on the forged Lien Release and the false information he previously provided to the company. Throughout this time period, Henderson wired multiple payments for the financed Tahoe. However, only one of the payments was credited. The others failed because the originating bank accounts either lacked sufficient funds or were nonexistent.

A grand jury indicted Henderson on two counts: wire fraud, in violation of 18 U.S.C. § 1343, and mail fraud, in violation of 18 U.S.C. § 1341. Henderson pleaded guilty to wire fraud, and in exchange the government dismissed the mail fraud charge. While Henderson awaited sentencing, probation officers uncovered another one of his fraud schemes:

> [A]gents learned that Henderson was planning to start a new business named the Committee for Ex-Offenders Equality Association, which appeared to be an auxiliary to Henderson's Holy Temple National Assembly Church. . . . Henderson sought to rent property which was advertised for lease on Craigslist. The property included a business location and a residence in Florissant, Missouri. Specifically, in June 2014, Henderson contacted Meinecke Enterprises and arranged a meeting to discuss the lease of the property in Florissant, Missouri. Henderson and his associate . . . and an unknown male met with Meinecke and agreed to lease the property and possibly purchase the property by August 31, 2014. The rental application noted that the

-3-

applicant was the Holy Temple Church and the business at the location was to be named Committee Center of Holy Temple Outreach. On July 1, 2014, Henderson provided Meinecke three checks totaling $4,300.00. After attempting to deposit the checks, on July 3, 2014, the checks were returned as counterfeit as they purported to be drawn on a non-existent account located at Clayton Bank which is located in Tennessee.

*Id.* at 6–7 (bold omitted). The PSR also recounted Henderson's three prior federal convictions for bank fraud, manufacture of forged securities, and unlawful use of counterfeited securities.

Henderson's total offense level of nine and criminal history category VI yielded a Guidelines recommended range of 21 to 27 months' imprisonment. At sentencing, the government voiced its concerns regarding Henderson's history of noncompliance while on supervised released. It also advocated for a sentence at the high end of the Guidelines range, asking the court to take into account Henderson's lengthy criminal history involving misrepresentation. The government then asked the district court to impose as a special condition of supervised release that Henderson "cannot act in any capacity for any employer, including a church or nonprofit entity, in either a salaried or volunteer capacity, to include a board member or consultant without the prior approval of the U.S. Probation Office." Sentencing Hr'g Tr. at 9, *United States v. Henderson*, No. 4:14-cr-00207-HEA (E.D. Mo. Jan. 7, 2015), ECF No. 60.

Henderson objected, averring that the proposed condition inappropriately restricted his employment and infringed on his rights under the First Amendment. He suggested that the court instead impose conditions that prohibit him from "opening new [bank] accounts, . . . using checks, [and require him to] hav[e] a different financial officer at the church to handle the finances." *Id.* at 10. The district court adopted Henderson's recommendation and ordered that

[Henderson shall] not be self-employed or be employed as a "consultant" . . . without the written permission of the Probation Office. [Henderson shall] not be employed as a board member or a consultant or a volunteer or aid or assistant or in any other capacity associated with the church that has been the subject of discussion here that would allow him in any way, shape, manner, or form access to or involvement in any type of financial activity.

*Id.* at 16. Further, the court barred Henderson from "creat[ing], operat[ing], manag[ing], or participat[ing] in the creation, operation, or management of any business entity, including a family business, without the written permission of the Probation Office." *Id.* at 19. These prohibitions subsequently became special conditions of supervised release 8 and 9, respectively. *See* Am. J. at 4, *United States v. Henderson*, No. 4:14-cr-00207-HEA (E.D. Mo. Feb. 17, 2015), ECF No. 65.

In imposing the special conditions, the court carefully explained to Henderson that he was to have no part in the financial matters of any organization, including his church. The court noted that "[e]verybody has th[e] right to participate in their church, to express their belief, [and] to proceed with an expression of their religion." Sentencing Hr'g Tr. at 24. According to the court, Henderson may participate in church activities; he simply may not "do anything that has to do with money in the church." *Id.* at 18. Henderson assured the district court that he understood the restrictions. The court sentenced Henderson to 27 months' imprisonment, followed by three years of supervised release. The sentence was at the top of the calculated Guidelines range.

### B. *Revocation Proceedings*

Henderson's incarceration ended in March 2017, and his three-year supervised release commenced. In May 2017, the probation office suspected that Henderson had violated his probation conditions, again while living at a Bureau of Prisons halfway house. The government initiated an investigation, which revealed that Henderson,

under the name Bishop Larry Henderson-Bey, had begun administering a public Facebook page entitled "The National Assembly of Churches." Government's Motion to Revoke Def.'s Supervised Release at 2, *United States v. Henderson*, No. 4:14-cr-00207-HEA (E.D. Mo. May 3, 2017), ECF No. 73 The page's cover photo showed an image of Henderson at a desk in an office setting, superimposed by a logo of the organization. The cover also included the coat of arms of the Bishop of the National Assembly of Churches. Henderson frequently updated the Facebook page and informed visitors that he also managed "The Daniel Matthews Ecclesiastical College" ("Daniel Matthews"). The college proclaimed itself to be the "largest ecclesiastical college providing marketable/occupational studies to local churches and ex-offenders," which had been in operation for more than 24 years. *Id.* at 3. Daniel Matthews's Facebook page identified Henderson's son, Daniel L. M. Henderson, as the "Chair of [the] Board of Incorporators." *Id.*

Henderson posted multiple advertisements for Daniel Matthews, including job offers and free or reduced tuition offers. Henderson's Facebook page also provided enrollment information for Daniel Matthews and provided a Paypal hyperlink where prospective students could pay their application fees. Henderson posted photos of purported sites for the college's St. Louis headquarters, credit union, and admissions office. Some posts provided a phone number for the college; the number was Henderson's personal cell phone number.

The government's investigation exposed the entire Daniel Matthews operation as fraudulent. Alleging that Henderson violated special conditions 8 and 9, the government filed a motion to revoke Henderson's supervised release. One week after its first motion, the government filed a supplemental motion to revoke after interviewing two individuals. One person was hired by Daniel Matthews to perform maintenance. Henderson interacted with this individual on behalf of the college. This person told government investigators that all of his paychecks from Daniel Matthews were returned because of insufficient funds. The second person the government

investigators interviewed identified herself as a student registrant at Daniel Matthews. She, too, communicated with Henderson who claimed to represent the college. After learning that all Daniel Matthews offices had been closed and the scheduled student orientation canceled, she called Henderson to complain. Henderson then assured her that the orientation had been rescheduled; he also offered her a job at Daniel Matthews.

Approximately one month after the government's supplemental motion to revoke, the probation office petitioned the court to issue a warrant for Henderson's arrest, alleging that Henderson violated two standard conditions and special conditions 7 and 9 of supervised release. In its petition, the probation office noted that during every telephone and face-to-face contact with Henderson, he assured the probation officer that he was not operating or managing a business. The probation office expressly stated that its petition was submitted as a supplement to the government's motions. Henderson subsequently was arrested and released on his own recognizance. Between the original motion to revoke and the two subsequent supplemental motions, the government and the probation office together alleged that Henderson violated two standard conditions as well as specials conditions 7, 8, and 9.

At the revocation hearing, Henderson's counsel stated to the court that Henderson wanted to waive the hearing for the two Grade C[3] violations corresponding to special conditions 8 and 9. Henderson then asked the court to permit him to continue his supervised release, or in the alternative, to be sentenced to home confinement. The government objected, noting that in an effort to remain on supervised release, Henderson procured a forged letter on Daniel Matthews

---

[3]A Grade C violation is "conduct constituting (A) a federal, state, or local offense punishable by a term of imprisonment of one year or less; or (B) a violation of any other condition of supervision." U.S.S.G. § 7B1.1(a)(3).

letterhead, purportedly from the dean and general board member of the college, asking the court not to send Henderson back to prison. The government also pointed out that Henderson lied to the court, claiming he had diabetes and a heart condition that required surgery. The government concluded that Henderson's "probation should be revoked or his supervised release should be revoked; that he should be confined because, quite frankly, he isn't going to stop unless he is confined. And we have seen that time and time again." Supervised Release Revocation Hr'g Tr. at 19, *United States v. Henderson*, No. 4:14-cr-00207-HEA (E.D. Mo. July 20, 2017), ECF No. 118.

The district court, after placing Henderson under oath, confirmed that Henderson admitted the two Grade C violations and waived the hearing. The court advised Henderson of the consequences of his admission and waiver. It then reminded Henderson of its effort to ensure that Henderson understood fully the special conditions of supervised release at the original sentencing. The district court then sentenced Henderson to 12 months and 1 day in the Bureau of Prisons, followed by 18 months of supervised release, for violating special conditions 8 and 9. The court also imposed the same conditions of supervised release imposed at Henderson's original sentencing, including the special conditions. The written judgment, however, stated that Henderson violated standard conditions 2 and 3 and special conditions 7 and 9. *See* J. at 1–2, *United States v. Henderson*, No. 4:14-cr-00207-HEA (E.D. Mo. July 20, 2017), ECF No. 108.

## II. *Discussion*

Henderson now challenges his revocation of supervised release, claiming insufficiency of the evidence. He also argues that the supervised release special conditions should be removed. We disagree and affirm.

A. *Sufficiency of the Evidence to Revoke Supervised Release*

Henderson claims the district court lacked sufficient evidence to revoke his supervised release. The written judgment reflected that Henderson violated standard conditions 2 and 3 and special conditions 7 and 9. Henderson argues that he did not admit to violating the standard conditions or to violating special condition 7. Further, he asserts that the government presented no evidence for those violations. Henderson also contends that the probation office's petition to revoke supersedes the government's two prior motions to revoke.

Usually, "[t]he court's . . . factfinding as to whether or not a violation occurred is reviewed for clear error." *United States v. Boyd*, 792 F.3d 916, 919 (8th Cir. 2015) (quoting *United States v. Carothers*, 337 F.3d 1017, 1019 (8th Cir. 2003)). But when an appellant fails to raise his objections before the district court, we review for plain error. *United States v. Taylor*, 747 F.3d 516, 519 (8th Cir. 2014) (citing *United States v. Taylor*, 679 F.3d 1005, 1007 (8th Cir. 2012)). A single violation based on a preponderance of the evidence is sufficient for revocation. *United States v. Miller*, 557 F.3d 910, 914 (8th Cir. 2009) (citing 18 U.S.C. § 3583(e)(3)).

We will reverse for clear error "only if we have a definite and firm conviction that the District Court was mistaken." *United States v. Willis*, 433 F.3d 634, 636 (8th Cir. 2006) (quoting *United States v. Bahena*, 223 F.3d 797, 802 (8th Cir. 2000)). In contrast, we will reverse for plain error only when we find an "(1) error, (2) that is plain, and (3) that affects substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Pirani*, 406 F.3d 543, 550 (8th Cir. 2005) (en banc) (quoting *Johnson v. United States*, 520 U.S. 461, 466–67 (1997)). The government asserts that because Henderson failed to raise objections before the district court, plain error review is appropriate. Henderson, to the contrary, argues that our review on this issue should be for clear error, since he had no opportunity to object to the

district court's written judgment. We conclude that Henderson's sufficiency argument fails under either standard of review. The district court had undisputed evidence that Henderson violated the conditions of his supervised release.

First, we note that the probation office's petition to revoke did not supersede the government's two prior motions. Rather, the petition expressly stated that it supplemented the two previous motions by the government. *See* Pet. for Warrant or Summons for Offender Under Supervision at 4, *United States v. Henderson*, No. 4:14-cr-00207-HEA (E.D. Mo. June 12, 2017), ECF No. 90 ("This petition is submitted as a supplement to the Government's Motions."). Thus, between the two motions and the petition, the government alleged that Henderson violated two standard conditions and special conditions 7, 8, and 9. At the revocation proceeding, Henderson waived the hearing and admitted to violating special conditions 8 and 9, and the district court revoked Henderson's supervised release based on those two violations. The written judgment incorrectly reflected that Henderson violated two standard conditions and special condition 7; it correctly noted that Henderson violated special condition 9 but omitted Henderson's violation of special condition 8.

"When a district court's oral sentence conflicts with the written judgment, 'the oral sentence controls.'" *United States v. Silva*, 865 F.3d 1027, 1029 (8th Cir. 2017) (per curiam) (quoting *United States v. Foster*, 514 F.3d 821, 825 (8th Cir. 2008)). Further, "[t]he Supreme Court or any other court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review." 28 U.S.C. § 2106. A remand to the district court is unnecessary when we can "correct the error ourselves." *United States v. Anobah*, 734 F.3d 733, 739 (7th Cir. 2013); *see also United States v. Noble*, 179 F. App'x 400, 401 (8th Cir. 2006) (per curiam) (modifying written judgment without remand). Here, because Henderson admitted to violating special conditions 8 and 9 of his supervised release, the district court had ample evidence to revoke. No remand is necessary, and

we modify the judgment to reflect that Henderson violated special conditions 8 and 9 of his supervised release.

## B. *Imposition of the Special Conditions*

Henderson for the first time on appeal challenges the imposition of the two special conditions, contending they (1) are not reasonably related to the 18 U.S.C. § 3583(d) sentencing factors; (2) involve a greater deprivation of liberty than reasonably necessary; and (3) are inconsistent with the pertinent policy statements from the Sentencing Commission. Because Henderson failed to object to the special conditions to the district court, we review for plain error. *See United States v. Carlson*, 406 F.3d 529, 531 (8th Cir. 2005) ("When a defendant fails to object to the special condition at sentencing, . . . we review for plain error." (citation omitted)).

## 1. *Reasonably Related to § 3583(d) Sentencing Factors*

Henderson argues that the special conditions are not reasonably related to the sentencing factors. However, on this issue, Henderson focuses only on the court's restriction on his involvement with church finances. *See* Appellant's Br. at 30–31. We therefore limit our inquiry to that special condition. *See Chay-Velasquez v. Ashcroft*, 367 F.3d 751, 756 (8th Cir. 2004) ("Since there was no meaningful argument on this claim in his opening brief, it is waived.")

> Pursuant to 18 U.S.C. § 3583(d), [a] district court has broad discretion to impose special conditions of supervised release. Under § 3583(d), special conditions must be reasonably related to four factors: the nature and circumstances of the offense and the history and characteristics of the defendant, the need to afford adequate deterrence to criminal conduct, the need to protect the public from future crimes of the defendant, and the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. The special condition need not be related to all four factors; instead, the factors are weighed independently.

-11-

*United States v. Moore*, 860 F.3d 1076, 1078 (8th Cir. 2017) (alteration in original) (citations and internal quotations omitted). Henderson argues that the special condition is not reasonably related to the sentencing factors because "the only involvement of Henderson's church was as the payee of a cashier's check in the amount of $2,000 that Henderson had secured *after* having already perpetrated the loan fraud upon Missouri Title." Appellant's Br. at 30. He likens his case to *United States v. Wittig*, 528 F.3d 1280 (10th Cir. 2008).

As a case from a sister circuit, *Wittig* is not binding on this court. *Wittig* is also readily distinguishable. In *Wittig*, the district court barred the defendant from employment "in any capacity in which he will have executive authority over any business, company or agency, and shall not engage in any financial agreements or negotiations involving any business, company or agency without the prior approval of the Court." *Id.* at 1284 (citation omitted). The Tenth Circuit reversed the district court, finding no relationship between the defendant's criminal conduct and his position as an executive; the court concluded that "[t]he offense of conviction was based on [the defendant's] personal conduct, not his conduct as an executive. . . . The mere fact [the defendant] engaged in [the criminal] conduct while employed as an executive does not establish the necessary connection between the conduct and his management/executive positions." *Id.* at 1288.

The *Wittig* defendant's criminal conduct—fraudulent concealment of a personal loan—was unrelated to his position as an executive. Henderson, on the other hand, intertwined his church activities with his fraudulent dealings. Henderson's restriction is in line with prior cases where we have upheld the employment prohibitions. *See*, *e.g.*, *Carlson*, 406 F.3d at 532 (affirming special condition prohibiting defendant from working in the medical field, because he "fraudulently obtained prescription medication hundreds of times over the course of several years. His occupation as an orthopedic physician's assistant placed him in close proximity

to prescription medication, and he used sample medications obtained through his employment on at least two previous occasions" (citation omitted)); *United States v. Choate*, 101 F.3d 562, 566 (8th Cir. 1996) (affirming self-employment restriction where "[t]he district court had before it evidence of three separate businesses [the defendant] operated that all ended up perpetuating the same cycle of fraud. One of these businesses started up after [the defendant] was indicted").

We hold that the special condition barring Henderson from participating in any organizational financial activities during his supervised release is reasonably related to the § 3583(d) sentencing factors, and we find no error.

## 2. *Greater Deprivation of Liberty than is Necessary*

Henderson next contends that even if the two special conditions are reasonably related to the sentencing factors, the restrictions deprive Henderson of his liberty more than is necessary. He argues that neither restriction provides exceptions, and they are, therefore, overbroad. Further, Henderson suggests that the church finance prohibition infringes his First Amendment rights, as the restriction "would bar him from donating money to the church because such donation would be a type of financial activity." Appellant's Br. at 36. The conditions are neither overbroad nor do they prohibit him from contributing financially to religious organizations.

Henderson relies on *United States v. West*, 829 F.3d 1013 (8th Cir. 2016), to support his argument that the conditions are overbroad. In *West*, the defendant believed he was not required to pay federal income taxes; he wrote an e-book and managed, owned, participated in, or contributed to various websites regarding his tax avoidance schemes. *Id.* at 1016. Subsequent to the defendant's conviction for tax evasion, the district court barred the defendant from creating, establishing, or maintaining any websites; the court also prohibited the defendant from the use of any computers without the prior written approval of a probation officer. *Id.* at 1017. We reversed, noting that "[a]lthough [the defendant] misused his access to the Internet,

-13-

websites present an important mode of communicative and commercial intercourse in our society through which [the defendant] can exercise his right to speak." *Id.* at 1021. Further, we emphasized that because "[t]his court is 'particularly reluctant to uphold sweeping restrictions on important constitutional rights,' . . . such [absolute] bans are disfavored." *Id.* (alterations and ellipsis in original) (quoting *United States v. Bender*, 566 F.3d 748, 753 (8th Cir. 2009)).

Henderson faces no absolute or sweeping restrictions on important constitutional rights. In imposing the restriction on participation in church finances, the district court carefully explained to Henderson—both at the original sentencing and at the revocation hearing—that Henderson's participation in his church is narrowly limited to prohibiting *his handling of church finances*. Giving money to the church is not prohibited. *See United States v. Mefford*, 711 F.3d 923, 927 (8th Cir. 2013) ("We will only strike down a condition of supervised release as unconstitutionally overbroad 'if its overbreadth is real and substantial in relation to its plainly legitimate sweep.'" (quoting *United States v. Thompson*, 653 F.3d 688, 695 (8th Cir. 2011))). We note also that Henderson himself proposed this special condition to the district court.

### 3. *Consistence with Pertinent Policy Statements*

Although Henderson raises the contention that the special conditions are inconsistent with pertinent Sentencing Commission policy statements, he presents no discussion as to how the conditions are inconsistent with any policy statements. We consider the claim waived for lack of a meaningful argument. *See Chay-Velasquez*, 367 F.3d at 756.

### III. *Conclusion*

We affirm the district court, but we modify Henderson's revocation judgment to reflect accurately that he violated only special conditions 8 and 9 of his supervised release.

_____